1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
                                            )
LEI LANI CARDER-COWIN,                      )        No. C07-104RSL
                                            )
                      Plaintiff,            )        ORDER GRANTING DEFENDANT'S
         v.                                 )        MOTION FOR SUMMARY
                                            )        JUDGMENT SEEKING DISMISSAL
UNUM LIFE INSURANCE COMPANY OF              )        OF ERISA ACTION, AND ORDER
AMERICA,                                    )        DENYING AS MOOT DEFENDANT'S
                                            )        PREEMPTION SUMMARY
                      Defendant.            )        JUDGMENT MOTION
_____     )

## I. INTRODUCTION

This matter comes before the Court on "Defendant's Motion for Summary Judgment Regarding Contractual Limitations Clause and Preemption" (Dkt. #12) and "Defendant's Motion for Summary Judgment Seeking Dismissal of Plaintiff's ERISA Action" (Dkt. #18).   The Court held a hearing on the motions on April 11, 2008 and heard oral argument from counsel for plaintiff and defendant.  For the reasons set forth below, the Court grants defendant UNUM Life Insurance Company of America's ("UNUM" or defendant) motion for summary judgment seeking dismissal of plaintiff's ERISA action and dismisses as moot plaintiff's state-law claims.

## II. DISCUSSION

### A.    Background

Since December of 1981, plaintiff worked in the laboratory at a Ferndale, Washington

ORDER ON DEFENDANT'S
MOTIONS FOR SUMMARY JUDGMENT

refinery.  See U/A[1] 325; Dkt. #1 at ¶2.1.  As a Tosco employee, plaintiff was a participant in a group long-term disability policy issued by UNUM.  See Dkt. #1 ¶1.1.  On January 1, 2001, UNUM replaced Tosco's previous long-term disability provider.  Id. at ¶2.1; U/A 96 (noting policy's effective date of January 1, 2001); U/A 455-56 (stating that the previous Prudential policy terminated on December 31, 2000 and the UNUM policy was effective January 1, 2001); U/A 795 (confirming the January 1, 2001 effective date).

On March 5, 2001, plaintiff submitted a long-term disability claim because she was "not able to perform [her] duties" because of sickness based on: "fibromyalgia; PTSD; arthritis; back and feet degeneration; irritable bowel syndrome; G.E.R.D.; asthma; restless leg syndrome; migraine; depression; rosacea; migraines [sic]; hiatal hernia; bilateral carpel tunnel; tend[i]nitis bilateral hips; plantar faciati[i]s; tend[i]nitis (bilateral) elbows; left shoulder impingement; [and] R[ight] eye vision loss."  U/A 1054.  Plaintiff stopped work on January 24, 2001.  See U/A 148. In a letter dated March 12, 2001, UNUM informed plaintiff that it had received her disability claim and that a UNUM representative would contact her to discuss the claim.  See U/A 1018. On March 16, 2001, UNUM wrote to plaintiff advising her that it had completed the initial review of her claim, but needed additional medical records to determine whether plaintiff was disabled.  See U/A 1001.  In this letter, UNUM requested medical records from plaintiff's treating physicians—Drs. Sakahara, Kukes, and Peterson—and stated:  "Once we have the necessary information, we will compare your current limitations to the requirements of your occupation to determine if you are eligible for benefits."  Id.; see also U/A 994 (April 3, 2001 UNUM letter requesting plaintiff's "assistance in expediting [her] claim by encouraging [her] doctors to respond as soon as possible").  On April 27, 2001, UNUM wrote to plaintiff to request a Physiatry Independent Medical Exam ("IME").  See U/A 838.  While the request for information was pending, on May 17, 2001, UNUM paid plaintiff benefits after the 180-day

---

[1] For clarity, the Court references the bates-stamped "U/A" prefix for citations to the record.

ORDER ON DEFENDANT'S
MOTIONS FOR SUMMARY JUDGMENT            -2-

1   limitation period for July 24, 2001 to August 23, 2001 under a reservation of rights until the

2   final determination of her eligibility.  See U/A 833.  On July 27, 2001, UNUM's examining

3   physician Dr. Aleksandra Zietak performed an IME.  See U/A 742-748.  As part of UNUM's

4   claim review, UNUM also retained an investigator, who observed plaintiff on July 5-6, 2001.

5   See U/A 765-72.  Finally, on November 13, 2001, UNUM had its vocational consultant, Ms.

6   Kristi Waterfield, review plaintiff's occupational demands.  See U/A 737.

7        On November 28, 2001, UNUM completed its review of plaintiff's claim and determined

8   that she was not eligible for benefits and informed plaintiff of her right to appeal this

9   determination to UNUM or the determination would become final.  See U/A 733-36.  On

10  January 18, 2002, plaintiff's attorney appealed the November 28, 2001 decision to UNUM and

11  also requested the documents considered or relied upon by UNUM in making the determination.

12  See U/A 554; U/A 559 (UNUM's letter acknowledging the appeal and also indicating that it was

13  providing the requested information); U/A 561 (February 8, 2002 letter providing documents

14  requested from claim file).  On May 6, 2002, UNUM completed its appellate review of the claim

15  and determined that the denial of claims was appropriate and final.  See U/A 147-51.

16       Following UNUM's review, on June 3, 2002 plaintiff's attorney requested that UNUM

17  reconsider the May 6, 2002 denial of benefits based on new information from plaintiff's treating

18  physicians.  See U/A 141 (stating "[i]n my initial correspondence I informed you that I would be

19  providing you with information from her treating physicians.  Despite my best efforts, I have just

20  recently received definitive letters from Mrs. Carder-Cowin's treating doctors and have enclosed

21  them for your review.").  On June 25, 2002, UNUM completed the second appellate review and

22  concluded that "[u]pon review of the additional information that you submitted with your letter

23  of June 3, 2002, we find that our previous decision to deny any liability on your client's claims

24  was correct and we are upholding that determination."  See U/A 138-39.

25  **B.    Procedural History**

26       Over four years later, on January 23, 2007, plaintiff filed this action against defendant

ORDER ON DEFENDANT'S
MOTIONS FOR SUMMARY JUDGMENT          -3-

claiming breach of contract, bad faith, and violation of ERISA.  <u>See</u> Dkt. #1 (Complaint).  On December 18, 2007, defendant filed a motion for summary judgment regarding the contractual limitations clause and preemption.  <u>See</u> Dkt. #12.  On January 8, 2008, defendant filed a second motion for summary judgment seeking dismissal under ERISA.  <u>See</u> Dkt. #18.  On April 11, 2008, the Court held a hearing on these two motions.  <u>See</u> Dkt. #39 (Minute entry).  After the hearing, on April 22, 2008, the Court ordered defendant to provide supplemental information regarding the independence of its medical examiner, Dr. Zietak, in order for the Court to determine the effect, if any, that the structural conflict of interest may have had on defendant's decision-making process.  <u>See</u> Dkt. #34 (Order Requesting Supplemental Information) (citing <u>Abatie v. Alta Health & Life Ins. Co.</u>, 458 F.3d 955, 969 & n.7 (9th Cir. 2006) (en banc)).  In accordance with the Court's order, defendant filed its supplemental materials on May 6, 2008, and provided the Court with information regarding the independence of its medical examiner, including a curriculum vitae and a declaration from Dr. Zietak.  <u>See</u> Dkt. #35.  On May 19, 2008, plaintiff filed an opposition to defendant's supplemental material, including excerpts from a deposition of Dr. Zietak in an unrelated state-court case.  <u>See</u> Dkt. #36 (Opposition); Dkt. #37 (Hammack Decl.), Ex. A (Zietak deposition excerpts).  Shortly thereafter, defendant filed a surreply under Local Civil Rule 7(g) on May 20, 2008, moving to strike the deposition excerpts. <u>See</u> Dkt. #40 (Surreply).[2]  Therefore, defendant's motions are now fully briefed for the Court's consideration.

**C.    Analysis**

    **1.    Preemption**

    Defendant contends in its motion for summary judgment regarding preemption that plaintiff's state law claims for breach of contract and bad faith should be dismissed as preempted

---

[2]  The Court addresses defendant's motion to strike as part of section II.C.2(a), below.

1   by ERISA.  See Dkt. #12.  In response to defendant's motion, plaintiff stipulated to dismissal of

2   her breach of contract claim.  See Dkt. #14 at 1 ("Plaintiff stipulates to the dismissal of

3   Plaintiff's breach of contract claim.").  Therefore, the only issue remaining from defendant's

4   first summary judgment motion[3] is whether plaintiff's claim for bad faith is preempted by

5   ERISA.  At the April 11, 2008 hearing, however, plaintiff withdrew her bad faith claim.

6   Accordingly, plaintiff's state law claims for breach of contract and bad faith are DISMISSED

7   AS MOOT.  Plaintiff's claim against defendant is covered by ERISA, and if she is to prevail,

8   plaintiff must do so under ERISA's civil enforcement provisions in 29 U.S.C. § 1132.  The

9   Court now turns to the appropriate standard of review under ERISA.

10          **2.      Standard of Review**

11          The Court reviews benefit denials under ERISA de novo "unless the benefit plan gives

12   the administrator or fiduciary discretionary authority to determine eligibility for benefits."

13   Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  If the plan does grant

14   discretionary authority, the Court reviews the administrator's decision for abuse of discretion.

15   See Saffon v. Wells Fargo & Co. Long Term Disability Plan, 511 F.3d 1206, 1209 (9th Cir.

16   2008) (citing Firestone, 489 U.S. at 115).  Therefore, the first issue here is whether the ERISA

17   plan unambiguously provides discretion to the administrator.  See Abatie, 458 F.3d at 963

18   ("[F]or a plan to alter the standard of review from the default of de novo to the more lenient

19   abuse of discretion, the plan must unambiguously provide discretion to the administrator.")

20   (citing Kearney v. Standard Ins. Co., 175 F.3d 1084, 1090 (9th Cir. 1999) (en banc)).

21          The plan in this case provides:

22          The policy is delivered in and is governed by the laws of the governing jurisdiction
        and to the extent applicable by the Employee Retirement Income Security Act of
23          1974 (ERISA) and any amendments.  When making a benefit determination under

24   _____

25          [3]  Defendant also moved for summary judgment on the contractual limitations clause, but
    withdrew this part of the motion in its reply.  See Dkt. #21 (Reply) ("[A]t this time UNUM withdraws
26   the remaining portion of the motion pertaining to the contractual limitations provision.").

ORDER ON DEFENDANT'S
MOTIONS FOR SUMMARY JUDGMENT              -5-

the policy, UNUM has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy.

U/A 105 (Certificate Section) (emphasis added).

Consistent with Ninth Circuit authority, the Court finds that this provision unambiguously vests discretion in UNUM as the plan's administrator.[4]  Abatie, 458 F.3d at 963 ("[W]e have repeatedly held that similar plan wording—granting the power to interpret plan terms and to make final benefits determinations—confers discretion on the plan administrator.") (citing Bergt v. Ret. Plan for Pilots Employed by Markair, Inc., 293 F.3d 1139, 1142 (9th Cir. 2002) and Grosz-Salomon v. Paul Revere Life Ins. Co., 237 F.3d 1154, 1159 (9th Cir. 2001)); see also Black & Decker Disability Plan v. Nord, 538 U.S. 822, 833 (2003) (citation and quotation marks omitted)  ("[N]othing in ERISA requires employers to establish employee benefit plans. . . . Rather, employers have large leeway to design disability and other welfare plans as they see fit.").  Accordingly, the abuse of discretion standard of review applies.  Abatie, 458 F.3d at 965 ("When a plan confers discretion, abuse of discretion review applies").

> **(a)    Weighing the conflict of interest**

In this case, UNUM both administered and funded the plan.  Therefore, UNUM operated under what the Ninth Circuit calls a "structural conflict of interest."  Abatie, 458 F.3d at 965-66 ("On the one hand, such an administrator is responsible for administering the plan so that those who deserve benefits receive them [, while] [o]n the other hand, such an administrator has an incentive to pay as little in benefits as possible to plan participants because the less money the insurer pays out, the more money it retains in its own coffers.").  In determining whether UNUM abused its discretion in denying plaintiff's claim, the conflict of interest does not change the

---

[4]  The Court rejects plaintiff's argument that there is a material distinction between "plan" and "policy" in this case that impacts the standard of review.  See Dkt. #26 ("The plan and the policy are two different things.").  In provisions that grant discretionary authority to the administrator, courts have found that the abuse of discretion standard applies regardless of whether the language refers to a policy or plan.  See, e.g., Abatie, 458 F.3d at 963 (quoting reference to the "policy" in the discretion-granting provision); Bendixen v. Standard Ins. Co., 185 F.2d 939,  943 (9th Cir. 1999) (same).

ORDER ON DEFENDANT'S
MOTIONS FOR SUMMARY JUDGMENT          -6-

1   standard of review, but rather is a factor to be weighed under all the facts and circumstances of

2   the case.  Id. at 968 ("A district court, when faced with all the facts and circumstances, must

3   decide in each case how much or how little to credit the plan administrator's reason for denying

4   insurance coverage.  An egregious conflict may weigh more heavily (that is, may cause the court

5   to find an abuse of discretion more readily) than a minor, technical conflict might.").

6         In order to determine the effect, if any, that the structural conflict may have had on

7   defendant's decision-making process, the Court may consider evidence outside of the

8   administrative record.  Id. at 970 ("The district court may, in its discretion, consider evidence

9   outside the administrative record to decide the nature, extent and effect on the decision-making

10  process of any conflict of interest; the decision on the merits, though, must rest on the

11  administrative record once the conflict (if any) has been established, by extrinsic evidence or

12  otherwise.").

13        In this case, defendant relied primarily on the results of the IME performed on July 27,

14  2001 by Dr. Zietak to deny plaintiff's claim.  See, e.g., U/A 742-748.  However, as plaintiff

15  highlighted in her response to defendant's summary judgment motion, the record does not

16  provide any details regarding Dr. Zietak's qualifications.  See Dkt. #26 at 6.  The record itself

17  also does not provide the Court with any indication regarding the extent to which Dr. Zietak is a

18  truly independent medical examiner.  See Abatie, 458 F.3d at 969 & n.7 ("[A] conflicted

19  administrator, facing closer scrutiny, may find it advisable to bring forth affirmative evidence

20  that any conflict did not influence its decision making process, evidence that would be helpful to

21  determining whether or not it has abused its discretion.  For example, the administrator might

22  demonstrate that it used truly independent medical examiners[.]") (emphasis added).

23        As a result, the Court ordered defendant to provide supplemental information

24  demonstrating Dr. Zietak's qualifications to perform plaintiff's IME and showing the extent to

25  which Dr. Zietak was a truly independent examiner.  See Dkt. #34.

26        The supplemental information provided by defendant shows that Dr. Zietak was a truly

independent medical examiner qualified to evaluate plaintiff's conditions.  Dr. Zietak declared:

> Although Unum Life Insurance Company requested that I perform the IME, I have no past or present relationship with Unum Life Insurance Company or any of its affiliate companies.  Any compensation I received for performing the IME was not dependent, in any way, on the outcome of the IME.  I came to the medical conclusions stated in my report of July 27, 2001 based on my own professional judgment after examining Ms. Carder-Cowin and reviewing the medical records provided to me in advance of her appointment.

Dkt. #35 (Zietak Decl.) at ¶6.  Furthermore, Dr. Zietak has been board certified in physical medicine and rehabilitation since 1986, and her practice specifically includes the treatment of fibromyalgia.  Id. at ¶3.

In both her response to the summary judgment motion and defendant's supplemental information, plaintiff contests Dr. Zietak's independence by questioning the phrase in her report stating the "evidence suggests a prophylactic lifestyle preference," contending that it simply parrots language in UNUM's letter sent to Dr. Zietak in preparation for the IME.  See U/A 202, 217; Dkt. #36 at 2-3 (stating "Dr. Zietak claims that she came to the medical conclusions derived in her report based on her own professional judgment but fails to explain why her conclusions mimic the form letter supplied to her by UNUM"); Dkt. #26 at 6.  The Court, however, does not find that the use of this phrase in Dr. Zietak's seven page, single-spaced report, demonstrates Dr. Zietak's lack of independence.  See U/A 204-210.  While it is true that UNUM sent Dr. Zietak a form letter regarding protocol for the IME, the phrase at issue was within a list of boilerplate IME questions from UNUM, including the specific question:  "Is it medically necessary for <<him/her>> to be completely off work or does the evidence suggest a prophylactic, lifestyle preference?"  U/A 217.  Under this question, Dr. Zietak could either conclude that it was medically necessary for plaintiff to be off work, or, that it was the result of a preference for a prophylactic lifestyle.  Simply because Dr. Zietak concluded that plaintiff was off of work due to a "prophylactic lifestyle preference," and used this phrase in the IME report, does not demonstrate a lack of independence in medical judgment.  The question in UNUM's form letter was phrased in the alternative, and Dr. Zietak could have concluded it is "medically necessary

ORDER ON DEFENDANT'S
MOTIONS FOR SUMMARY JUDGMENT                -8-

1   for plaintiff to be completely off work" and this also, by itself, would not show that Dr. Zietak

2   lacked independence.[5]

3       Plaintiff also claims, based on excerpts from Dr. Zietak's deposition in an unrelated state-

4   court case, that Dr. Zietak was not qualified to perform plaintiff's IME.[6]  See Dkt. #36 (citing

5   prior deposition testimony and asserting that "[t]here is no argument and no attempt by

6   Defendant UNUM to qualify Dr. Zietak as an expert in the area of fibromyalgia.").   The

7   deposition testimony, however, is not inconsistent[7] with the statements in Dr. Zietak's

8   declaration, and does not impeach her independence or qualification to perform plaintiff's IME.

9       Based on the supplemental information, the Court finds that the structural conflict did not

10  influence defendant's decision-making process to the extent it relied on Dr. Zietak's IME.

11  Despite the independence of defendant's medical examiner, however, in determining whether

12  defendant abused its discretion, the Court weighs the structural conflict of interest heavily and

13  views defendant's benefits decision with skepticism given UNUM-Provident Corp.'s

14  parsimonious claims-granting history.  See Abatie, 458 F.3d at 968 ("The level of skepticism

15  with which a court views a conflicted administrator's decision may be low if a structural conflict

16

17      [5] In fact, Dr. Zietak concluded that in her professional opinion "it is not medically necessary for
18  the patient to be completely off work."  U/A 210 (emphasis added).

19      [6] Although plaintiff's submission of Dr. Zietak's deposition testimony from another case is
20  improper under Fed. R. Civ. P. 32, the Court denies defendant's motion to strike this material because
    the material does not affect the outcome in this case due to its marginal relevance regarding Dr. Zietak's
21  qualification to perform the IME and Dr. Zietak's independence.  See, e.g., Fed. R. Civ. P. 32(a)(8); Nw.
    Nat'l Ins. Co. v. Baltes, 15 F.3d 660, 662 (7th Cir. 1994) ("Many of the attachments were pages of
22  depositions taken in other actions, which could be used if the other actions were 'between the same
    parties or their representatives or successors in interest', [former] Fed. R. Civ. P. 32(a)(4), a condition
23  that does not appear to have been met.").

24      [7] The fact that Dr. Zietak stated in a deposition that she was a "generalist" within the "specialty"
25  of physical medicine and rehabilitation is not directly incongruent with her declaration where she states
    that her practice "specifically involves the diagnosis and treatment of fibromyalgia."  See Dkt. #37, Ex. A
26  at 12:5-10; Dkt. #35 (Zietak Decl.) at ¶4.

ORDER ON DEFENDANT'S
MOTIONS FOR SUMMARY JUDGMENT          -9-

1  of interest unaccompanied, for example, by any evidence of malice, of self-dealing, or of a

2  parsimonious claims-granting history."); Saffon, 511 F.3d at 1210 ("Unum-Provident Corp. . . .

3  boosted its profits by repeatedly denying benefits claims it knew to be valid.  Unum-Provident's

4  internal memos revealed that the company's senior officers relied on ERISA's deferential

5  standard of review to avoid detection and liability.") (citing John H. Langbein, Trust Law As

6  Regulatory Law: The UNUM/Provident Scandal and Judicial Review of Benefit Denials Under

7  ERISA, 101 N.W. U. L. Rev. 1315, 1317-21 (2007) (describing Unum-Provident's behavior)).

8         **(b)     Weighing the alleged procedural irregularity**

9        Plaintiff contends that she did not receive a copy of the UNUM plan.  See Dkt. #27

10  (Carder-Cowin Decl.) at ¶3[8] ("I did not receive a copy of a policy or summary plan description

11  of any sort after Unum became the provider."); Dkt. #14 at 6.  Based on this contention, plaintiff

12  asserts that UNUM procedurally violated ERISA and therefore the Court should review

13  UNUM's benefits decision de novo.  See Dkt. #26 at 10.  Ordinarily, an administrator's failure

14  to comply with ERISA's procedural notice requirements does not alter the standard of review.

15  See Abatie, 458 F.3d at 971.  However, "[w]hen an administrator engages in wholesale and

16  flagrant violations of the procedural requirements of ERISA, and thus acts in utter disregard of

17  the underlying purpose of the plan as well, [the Court] review[s] de novo the administrator's

18

19  ────────────────

20     [8] In its reply, defendant moves to strike plaintiff's declaration and accompanying exhibit.  See
Dkt. #28 (Reply) at 4 (moving to strike plaintiff's declaration (Dkt. #27)).  The Court, however, denies

21  the motion to strike because the material in plaintiff's declaration is relevant to the Court's determination
of whether there was a procedural irregularity in this case.  A "court may consider evidence beyond that

22  contained in the administrative record that was before the plan administrator, to determine whether a
conflict of interest exists that would affect the appropriate level of judicial scrutiny."  Abatie, 458 F.3d at

23  970; 973 ("When a plan administrator has failed to follow a procedural requirement of ERISA, the court
may have to consider evidence outside the administrative record.").  Furthermore, defendant conceded in

24  its first summary judgment motion that the declaration presented a disputed material issue of fact whether
plaintiff had received a copy of the plan.  See Dkt. #21 at 1 ("However, as unbelievable as it is, Plaintiff's

25  declaration denying receipt of the SPD and policy admittedly presents a factual dispute regarding whether

26  she received UNUM's policy or SPD.").

ORDER ON DEFENDANT'S
MOTIONS FOR SUMMARY JUDGMENT     -10-

1    decision to deny benefits." Id.  Here, even assuming plaintiff did not receive a copy of the

2    UNUM plan, the Court faces the "ordinary situation in which a plan administrator has exercised

3    discretion but, in doing so, has made procedural errors."   Id. at 972.

4         ERISA requires plan administrators to furnish each participant with a summary plan

5    description within ninety days after an employee becomes a participant.  See 29 U.S.C. §

6    1024(b)(1)(A) ("The administrator shall furnish to each participant . . . a copy of the summary

7    plan description . . . within 90 days after he becomes a participant[.]").  It is clear under Ninth

8    Circuit authority that if an administrator fails to provide information requested, even if orally,

9    the administrator may be liable under 29 U.S.C. § 1132(c) for damages.  See Crotty v. Cook,

10   121 F.3d 541, 548 (9th Cir. 1997) ("[I]f the participant requests something he was entitled to

11   receive automatically, without any request, then the civil enforcement penalty provision [29

12   U.S.C. § 1132(c)] applies without regard to whether the request was in writing[.]") (emphasis

13   added).  However, where there has been no request for the information, courts have determined

14   that, "[t]here is no specific [ERISA] provision providing specific relief for a violation of this

15   duty." Simeon v. Mount Sinai Medical Ctr., 150 F. Supp. 2d 598, 604 (S.D.N.Y. 2001).   In this

16   situation, the Court in its discretion may, but is not required to, provide equitable relief for a

17   procedural violation of § 1024(b)(1).  Id. ("Therefore, there is nothing that precludes equitable

18   relief for a violation of 29 U.S.C. § 1024(b)(1)."); Colarusso v. Transcapital Fiscal Sys., Inc.,

19   227 F. Supp. 2d 243, 260 (D.N.J. 2002) ("[W]here, as here, a plan administrator fails to provide

20   a plan participant with information ERISA requires the plan administrator to automatically

21   furnish and there are no specific penalty provisions for such failure, pursuant to 29 U.S.C. §

22   1132(a)(3), a court may impose any appropriate equitable relief[.]"); 29 U.S.C. § 1132(c)(1)

23   (granting the court discretionary authority over equitable relief)).

24        Based on the facts presented in the record, the Court declines to award plaintiff equitable

25   relief or review UNUM's decision de novo because the alleged procedural violation is not

26   tantamount to a failure to exercise discretion.  See Abatie, 458 F.3d at 972 ("[W]hen a plan

ORDER ON DEFENDANT'S
MOTIONS FOR SUMMARY JUDGMENT          -11-

1  administrator's actions fall so far outside the strictures of ERISA that it cannot be said that the

2  administrator exercised the discretion that ERISA and the ERISA plan grant, no deference is

3  warranted."). Instead, as instructed by <u>Abatie</u>, the Court considers the contention that plaintiff

4  failed to receive a copy of the plan as "a matter to be weighed in deciding whether an

5  administrator's decision was an abuse of discretion." <u>Id.</u>  The Court, however, does not give

6  considerable weight to this procedural violation in its review for abuse of discretion because the

7  record shows that UNUM "engaged in an ongoing, good faith exchange of information" with

8  plaintiff and therefore "the court should give the administrator's decision broad deference

9  notwithstanding a minor irregularity." <u>Id.</u> at 972 (citations and quotation marks omitted).

10      Here, plaintiff has not alleged that she <u>requested</u> the plan information she claims she did

11  not receive. <u>See</u> Dkt. #27.  Beyond plaintiff's bare assertion in her declaration that "I had not

12  seen the [UNUM] plan before and had never received a copy" there is no evidence in the record

13  supporting this assertion. <u>See</u> Dkt. #27 at ¶3.[9]  Furthermore, although plaintiff's counsel did

14  submit a request for information, there is no evidence that UNUM failed in any way to provide

15  the information requested. <u>See</u> U/A 554 (requesting copies of the IME report and response

16  letter, all medical charts, investigator's report, and "any other documentation that was

17  considered or relied upon in your determination of the denial of benefits"); U/A 559 (UNUM's

18  letter indicating that it was providing the requested information).  To the contrary, the record

19  shows plaintiff received the information requested. <u>See</u> U/A 561 (letter providing documents

20  requested from claim file).

21

22  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

23      [9] <u>Accord</u> <u>Melton v. UNUM Life Ins. Co. of Amer.</u>, 2006 U.S. Dist. Lexis 71814, at *5-6 (W.D.
     Okla. Sept. 29, 2006) ("Beyond Plaintiff's bare statement that she was not given a copy of the policy, the

24  Court can find no evidence to support her assertion.  Plaintiff would have this Court believe that she filed
     a claim for benefits, an appeal of the initial denial, and an appeal of the subsequent denial under the policy

25  all without having ever seen a copy of the policy. . . . [T]he Court finds that Plaintiff's statement
     represents a 'mere scintilla' of evidence and that no reasonable jury could find that she did not receive a

26  copy of the policy at issue.").

ORDER ON DEFENDANT'S
MOTIONS FOR SUMMARY JUDGMENT          -12-

1      Additionally, plaintiff became a participant of the plan at issue on January 1, 2001 when

2  UNUM replaced Tosco's previous long-term disability provider.  See U/A 96; 795.

3  Accordingly, under 29 U.S.C. § 1024(b)(1)(A), UNUM had until April 1, 2001 to provide

4  plaintiff with a copy of the summary plan description.  The record shows that plaintiff ended her

5  employment on January 24, 2001.  See U/A 148.  Although plaintiff contends that the "Tosco

6  Refining Company" plan attached as Exhibit A to her declaration was the plan that she "used

7  and assumed applied," plaintiff submitted her long term disability claim on March 5, 2001 to

8  UNUM on a UNUM disability claim form.  See U/A 1054; Dkt. #27, Ex. A.  Plaintiff ultimately

9  obtained a full and fair review of her claim, and she has not shown that she has been prejudiced

10 in any way by UNUM's purported failure to provide her with a copy of the plan.  See U/A 138-

11 39; 147-151; 733-736; McKenzie v. General Tel. Co. of Cal., 41 F.3d 1310, 1315-16 (9th Cir.

12 1994) (holding that because the beneficiary had adequate notice of the applicable plan standards

13 and was not prejudiced in his opportunity to obtain a full and fair review of his claim, he was

14 not substantively harmed by the procedural violation).

15     Based on these factors, the Court views the alleged procedural irregularity of failing to

16 provide plaintiff with a copy of the UNUM plan as a matter to be weighed, with the structural

17 conflict of interest, in the Court's overall determination whether UNUM's decision was an abuse

18 of discretion.  Abatie, 458 F.3d at 972 ("[A] procedural irregularity, like a conflict of interest, is

19 a matter to be weighted in deciding whether an administrator's decision was an abuse of

20 discretion."); see also Heller v. CapGemini Earnst & Young Welfare Plan, 396 F. Supp. 2d 10,

21 21 (D. Mass. 2005) ("Because Patricia's receipt of the summary does not affect the summary's

22 underlying substance and more precisely, its indication of CapGemini's delegation of

23 discretionary authority to American, the denial of benefits in this case should be reviewed under

24 an arbitrary and capricious standard of review.").

25     Ultimately, "[w]hat [this] district court is doing in an ERISA benefits denial case is

26 making something akin to a credibility determination about the insurance company's or plan

ORDER ON DEFENDANT'S
MOTIONS FOR SUMMARY JUDGMENT          -13-

1   administrator's reason for denying coverage under a particular plan and a particular set of

2   medical and other records." Abatie, 458 F.3d at 969 ("We believe that district courts are well

3   equipped to consider the particulars of a conflict of interest, along with all the other facts and

4   circumstances, to determine whether an abuse of discretion has occurred.").  Under this case-

5   specific standard of review for abuse of discretion,[10] the Court now turns to the merits of

6   UNUM's decision to deny plaintiff's benefits claim.

7       **3.    UNUM did not abuse its discretion**

8       "Where the decision to grant or deny benefits is reviewed for abuse of discretion, a

9   motion for summary judgment is merely the conduit to bring the legal question before the

10  district court and the usual tests of summary judgment, such as whether a genuine dispute of

11  material fact exists, do not apply." Bendixen, 185 F.3d at 942. The only legal question before

12  the Court is whether defendant abused its discretion, or in other words, acted arbitrarily and

13  capriciously in denying plaintiff's long term disability claims.  The Ninth Circuit has held that

14  "[a]n ERISA administrator abuses its discretion only if it (1) renders a decision without

15  explanation, (2) construes provisions of the plan in a way that conflicts with the plain language

16  of the plan, or (3) relies on clearly erroneous findings of fact." Boyd v. Bell, 410 F.3d 1173,

17  1178 (9th Cir. 2005); see Taft v. Equitable Life Assurance Soc'y, 9 F.3d 1469, 1472 (9th Cir.

18  1993).  Viewing UNUM's decision skeptically under the case-specific abuse of discretion

19  standard discussed in section II.C.2 above, the Court finds that there is no evidence that any of

20  these factors is present.  There is evidence in the record supporting UNUM's conclusion that

21

22  _____

23      [10]  Following Abatie, the Ninth Circuit has characterized this level of inquiry as a "skeptical abuse
    of discretion review." See Baida v. First Unum Life Ins. Co., 2007 U.S. Dist. Lexis 29884, at *6 (9th

24  Cir. Dec. 20, 2007) ("Abatie had not been decided at the time the district court made its decision here.
    The district court's review of Unum's decision, however, would have been sufficient under the more

25  heightened, skeptical abuse of discretion review required by Abatie. See Abatie, 458 F.3d at 967-68
    (holding that the abuse of discretion standard of review will be more skeptical when a conflict of interest

26  or procedural violation is involved.")).

ORDER ON DEFENDANT'S
MOTIONS FOR SUMMARY JUDGMENT          -14-

1  plaintiff was not entitled to benefits under the plan.

2          (a)      **UNUM fully explained its decision**

3          First, UNUM throughly explained its decision in its initial four-page November 28, 2001

4  letter denying plaintiff's claim.  See U/A 733-36.  In this letter, UNUM informed plaintiff that

5  its decision was based on the findings from the IME, UNUM's vocational consultant, and

6  observations reported by the investigator retained by UNUM.  Id.  Specifically, UNUM

7  explained:

8          Since the Independent Medical Evaluation has determined that your disability
         status due to Fibrpomyalgia [sic] is not substantiated by the presented medical
9          information, and we have not received any medical evidence including psychiatric
         treatment notes to support your disability status due to depression, insomnia,
10         GERD, asthma, restless leg syndrome, migraine, rosacea, hiatal hernia, bilateral
         hip and elbow tend[i]nitis or vision loss, we are unable to accept liability for these
11         conditions.  Additionally, your carpal tunnel syndrome has been successfully
         treated and further diagnostic testing for residual effects has been negative.  Also,
12         your submitted medical evidence does not support or address what has changed
         within your chronic condition of plantar faciitis to support a disability status.  In
13         regard to your left shoulder, although Dr. Zietak has indicated that you are limited
         in overhead use and reaching, you have demonstrated your ability to lift, reach and
14         carry up to 20 pounds.  Further, reaching and overhead activities can be performed
         with your dominant right hand.  Therefore, we are unable to pay any further
15         benefits to you and your file will be closed.

16  U/A 735.  The letter closed by informing plaintiff of her appeal rights.  See id.

17          On January 19, 2002, plaintiff filed her notice of appeal without providing any additional

18  information.  See U/A 554.  On May 6, 2002, UNUM more fully explained the basis for its

19  decision in a five-page letter on appeal.  See U/A 147-151.  In this letter, UNUM reiterated that

20  plaintiff's "claims were denied because the available medical documentation did not support any

21  restrictions or limitations that would preclude her from performing the material duties of her

22  regular occupation as a Lab Technician."  U/A 148.  UNUM explained that this decision was

23  based on the results of the IME, the records from plaintiff's treating physicians—Drs. Sakahara

24  and Petersen—and the observations of UNUM's investigator.  Ultimately, UNUM concluded

25  that the available medical and video evidence "does not support any restrictions or limitations

26  that would preclude [plaintiff] from performing the material duties of her regular occupation as a

ORDER ON DEFENDANT'S
MOTIONS FOR SUMMARY JUDGMENT          -15-

1    Lab Technician during a day shift." U/A 150.

2          Finally, after receiving additional information from plaintiff's counsel and a request for

3    reconsideration, UNUM again explained the basis for denying plaintiff's claim in UNUM's June

4    25, 2002 second decision on appeal. See U/A 138-39. In this letter, UNUM explained why the

5    additional material submitted by plaintiff from Drs. Karuza, Sakahara, and Peterson did not

6    support plaintiff's claim. Id. UNUM noted that as a podiatrist, not only was Dr. Karuza not

7    qualified to comment on plaintiff's fibromyalgia condition, but importantly "[n]o examination

8    report or clinical findings were provided whatsoever to support his stated restrictions." U/A

9    138. Regarding the material from Drs. Sakahara and Peterson, UNUM explained that the

10   records from these treating physicians had been previously reviewed and did not support the

11   claimed restrictions, and the additional information did not contain any new clinical data or

12   objective information to justify reversal of UNUM's previous determination. U/A 139. UNUM

13   also explained that the letter from Ms. Hardin, LICSW, submitted without any psychological or

14   psychiatric records, did not show a psychiatric cause for plaintiff's decision to stop working. Id.

15   UNUM also concluded that Ms. Hardin's comments with respect to plaintiff's physical health

16   were outside her area of expertise. Id. Finally, UNUM concluded that the denial of plaintiff's

17   claims was justified based on the "clinical data on file, and the observed activities of [plaintiff]

18   which are in direct opposition to her stated self-reported restrictions and condition." U/A 139.

19         The foregoing correspondence shows UNUM had a meaningful dialog with plaintiff in

20   determining whether she was entitled to benefits, and UNUM afforded plaintiff numerous

21   opportunities to support her claim by supplementing it with additional information. Based on

22   the repeated and reasonable explanations for UNUM's decision, the Court finds that UNUM did

23   not abuse its discretion by failing to render a decision without explanation. See Saffron, 511

24   F.3d at 1216 ("[I]n determining the degree of deference to which MetLife is entitled, the district

25   court must consider MetLife's course of dealing with Saffron and her doctors."). The Court now

26   turns to UNUM's interpretation of the plan.

ORDER ON DEFENDANT'S
MOTIONS FOR SUMMARY JUDGMENT           -16-

1

2               **(b)      UNUM's interpretation was consistent with the plan's plain language**

3         The plan at issue in this case provides in relevant part:

4         You are disabled when UNUM determines that:

5         – you are limited from performing the material and substantial duties of your
          regular occupation due to sickness or injury; and
6         – you have a 20% or more loss in your Indexed monthly earnings due to the same
          sickness or injury.
7
          After 24 months of payments, you are disabled when UNUM determines that due
8         to the same sickness or injury, you are unable to perform the duties of any gainful
          occupation for which you are reasonably fitted by education, training or
9         experience.

10   U/A 109 (emphasis omitted); 1001.  In denying plaintiff's claims based on UNUM's

11   determination that there were no medical restrictions or limitations that would preclude her from

12   performing the material duties of her regular occupation (see U/A 138), UNUM interpreted the

13   plan, stating:

14        Please be advised that the intent of disability insurance is to provide a benefit if an
          individual is unable to perform the <u>material duties of her occupation</u>.  The
15        difference between an occupation and a job is that an occupation is a vocation or
          profession as typically performed in the general economy, whereas a job is a set of
16        work duties or shifts as performed for a specific employer.  While Ms. Carder-
          Cowin's employer may have requested that she begin to perform the night shift,
17        and this reportedly disturbed your client's sleep and prompted her disability leave,
          please be advised that her medical documentation on file does not support your
18        client's ability to perform her occupation in the day shift or any other Lab
          Technician day shift as it exists in the general economy.
19
     U/A 149 (emphasis added).
20
          The Court finds that UNUM's interpretation above is consistent with the plain language
21
     of the plan.  See U/A 129 (defining "regular occupation" as "the occupation you are routinely
22
     performing when your disability begins.  UNUM will look at your occupation as it is normally
23
     performed in the national economy, instead of how the work tasks are performed for a specific
24
     employer or at a specific location.").  Courts examining the "regular occupation" provision
25
     similar to the language at issue in this case, have found that "the term 'regular occupation' may
26

ORDER ON DEFENDANT'S
MOTIONS FOR SUMMARY JUDGMENT          -17-

be fairly construed to mean 'a position of the same general character as the insured's previous job, with similar duties and training requirements.'" Dionida v. Reliance Standard Life Ins. Co., 50 F. Supp. 2d 934, 939 (N.D. Cal. 1999) (quoting Dawes v. First Unum Life Ins. Co., 851 F. Supp. 118, 122 (S.D.N.Y. 1994) ("Under [an occupational insurance policy], 'regular occupation' is defined more narrowly than any means for making a living, but it is not limited to the insured's particular job.")). UNUM's interpretation of the "regular occupation" plan provision is consistent with the plain language interpretation courts have adopted. Therefore, the Court finds that UNUM did not abuse its discretion by construing provisions of the plan in a way that conflicts with the plain language of the plan. Furthermore, plaintiff has not challenged UNUM's plan interpretation.

### (c)     UNUM based its decision on reasonable findings

In section II.C.3(a) above, the Court quoted UNUM's explanation for its decision. The Court finds that UNUM's reasons for denying plaintiff's claim are credible and the decision was reasonable. First, UNUM based its decision primarily on the results of the IME, which concluded:

> In my professional opinion it is not medically necessary for the patient to be completely off work. The evidence suggests a prophylactic lifestyle preference. Because of the range of motion restrictions in the left shoulder, she is limited in overhead use and reaching with the left arm. There are no restrictions applicable to the right side carpel tunnel syndrome, which has been appropriately treated surgically. The job analysis for Lab Technician IV has been reviewed. The patient appears to have the physical capabilities to return to work in this occupation.

U/A 748 (emphasis added). It is true that Dr. Koyamatsu, plaintiff's treating physician at the refinery, opined on February 12, 2001 that "[i]n my view, Ms. Carder-Cowin can not [sic] perform the essential functions of her job even with reasonable accommodations." U/A 326 (emphasis added); Dkt. #26 (Response) at 3 (quoting Dr. Koyamatsu's letter). But, under ERISA, defendant is not required to accord the opinion of plaintiff's treating physician special deference. See also U/A 129; 149 (drawing distinction between "job" and "occupation").

ORDER ON DEFENDANT'S
MOTIONS FOR SUMMARY JUDGMENT          -18-

"[C]ourts [may not] impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Black & Decker Disability Plan, 538 U.S. at 834 (citation and quotation marks omitted) (rejecting a treating physician rule for plans covered by ERISA). Instead, "a single persuasive medical opinion may constitute substantial evidence upon which a plan administrator may rely in adjudicating a claim." Boyd, 410 F.3d at 1179. Significantly, UNUM's examining physician reviewed plaintiff's medical records and based her opinion in the IME in part on the findings of plaintiff's treating physicians. See U/A 742-48.

Plaintiff is correct that the examining physician did not reject her treating physician's diagnosis of fibromyalgia. See Dkt. #26 at 5 ("Frankly, Plaintiff is at a loss as to why Defendant Unum claims there is no evidence supporting the [fibromyalgia] diagnosis."); see U/A 358, 363, 1058 (showing plaintiff's primary complaint was fibromyalgia). But, the fibromyalgia diagnosis in the IME alone is not dispositive because the examining physician concluded that despite this diagnosis plaintiff is not totally disabled. See Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869, 880 (9th Cir. 2004) ("That a person has a true medical diagnosis does not by itself establish disability."); see also Safavi v. SBC Disability Income Plan, 493 F. Supp. 2d 1107, 1121 (C.D. Cal. 2007) ("[I]t is important to note that the consulting physicians did not conclude that Plaintiff was not suffering from endometriosis, fibromyalgia, or psychological issues. Rather, they conclude that given the evidence of her physical, cognitive, and psychological abilities as described by Plaintiff's treating physicians and Plaintiff herself, and as observed on the surveillance video, Plaintiff's condition did not rise to such severity that it would render her totally disabled.").

The Court finds under the facts of this case, that UNUM reasonably based its decision on the results of the IME. See Jordan, 370 F.3d at 878 ("Somebody has to make a judgment as to whether a medical condition prevents a person from doing her work, and the governing instrument assigns the discretion to the claims administrator. With a condition such as

1    fibromyalgia, where the applicant's physicians depend entirely on the patient's pain reports for

2    their diagnoses, their *ipse dixit* cannot be unchallengeable.  That would shift the discretion from

3    the administrator, as the plan requires, to the physicians chosen by the applicant, who depend for

4    their diagnoses on the applicant's reports to them of pain.").

5        Significantly, UNUM did not depend solely on the IME in evaluating plaintiff's claim.

6    UNUM also relied on the observations of its investigator and vocational consultant.  Therefore,

7    even when skeptically reviewing UNUM's decision for abuse of discretion, the Court cannot say

8    that UNUM acted arbitrarily or capriciously.  The Court finds that UNUM provided plaintiff

9    with a full and fair review of her claim.

10       The Court also finds that UNUM's structural conflict of interest as the plan's

11   administrator did not impact UNUM's decision-making process.  There is no evidence in the

12   record, other than the structural conflict of interest itself, tending to show that the conflict of

13   interest resulted in a breach of UNUM's fiduciary obligations to plaintiff.  See Alford v. DCH

14   Found. Group Long-Term Disability Plan, 311 F.3d 955, 957 (9th Cir. 2002).  The Court does

15   not find that UNUM's reason for denying plaintiff's claim was inconsistent, that it failed to

16   investigate or request information from plaintiff, or that it failed to credit the information

17   submitted by plaintiff.  See Abatie, 458 F.3d at 968-69; see also U/A 733-736; 147-151; 138-39.

18                          **III.  CONCLUSION**

19       For all of the foregoing reasons, the Court concludes that defendant did not abuse its

20   discretion in denying plaintiff's claim for benefits under ERISA.  The Court DISMISSES AS

21   MOOT plaintiff's breach of contract and bad faith claims, and therefore also DENIES AS

22   MOOT "Defendant's Motion for Summary Judgment Regarding Contractual Limitations Clause

23   and Preemption" (Dkt. #12).  The Court GRANTS "Defendant's Motion for Summary Judgment

24   Seeking Dismissal of Plaintiff's ERISA Action" (Dkt. #18).  The Clerk is directed to enter

25   judgment accordingly.

26

ORDER ON DEFENDANT'S
MOTIONS FOR SUMMARY JUDGMENT          -20-

1  DATED this 4th day of June, 2008.

2

3

4  Robert S. Lasnik
   United States District Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER ON DEFENDANT'S
MOTIONS FOR SUMMARY JUDGMENT          -21-